Laura CABRERA, Plaintiff–Appellant,

v.

CORDIS CORPORATION,
Defendant–Appellee.

No. 96–17017.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1997.

Decided Jan. 29, 1998.

Gerald I. Gillock, Gillock, Koning, Markley & Killebrew, Las Vegas, NV, for plaintiff-appellant.

Kathlene Landgraf Kolts (argued), Kolts and Nawa, Pasadena, CA, and Leann Sanders, Alverson, Taylor, Mortensen, Nelson & Sanders, Las Vegas, NV, for defendant-appellee.

Before: BOOCHEVER and KLEINFELD, Circuit Judges, and WILSON,* District Judge.

BOOCHEVER, Circuit Judge:

Laura Cabrera sued Cordis Corporation, alleging that a brain shunt manufactured by Cordis and implanted in her head was defectively designed, and that the silicone components in the shunt made her ill. The district court excluded the testimony of Cabrera's expert witnesses under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and granted summary judgment to Cordis. Cabrera appeals.

## FACTS

In 1977, Laura Cabrera, who was then fifteen years old, was diagnosed with hydrocephalus, a condition in which excess cerebral spinal fluid collects in the brain. To drain the excess fluid, Cabrera's neurosurgeon implanted a hydrocephalus shunt (technically known as a ventriculoperitoneal shunt) manufactured by Cordis Corporation. The shunt had a fin tipped catheter and a valve system, both of which were constructed with silicone rubber.

In the 1980s, Cabrera began experiencing severe allergies, chronic fatigue, and autoimmune disorders. She consulted a neurosurgeon about having the shunt removed, and he told her she was "shunt dependent," that is, she could not live without the shunt.

In 1994, Cabrera filed a complaint in federal district court (based on diversity of citizenship), alleging that her medical problems were the result of silicone toxicity. She claimed that the toxicity was caused by her body's production of silicone antibodies in response to the inappropriate composition of silicone in the shunt's component parts. She also alleged that the shunt was defectively designed, in that removal or replacement of the fin tipped catheter would require major surgery and removal of a portion of her brain tissue.

---

* Honorable Stephen V. Wilson, United States District Judge for the Central District of California, sitting by designation.

After discovery, Cordis filed a motion for summary judgment along with four motions in limine to exclude the testimony of Cabrera's four expert witnesses. The district court conducted a hearing to examine the experts and granted the motions in limine, excluding the testimony of all Cabrera's experts. The court then granted summary judgment in favor of Cordis, because without the expert witnesses, Cabrera had no evidence of causation, and there was no genuine issue as to any material fact on an essential element of the claim.

Cabrera appeals.

### DISCUSSION

■ This court reviews rulings on the admissibility of expert testimony under Fed. R.Evid. 702 for an abuse of discretion. *General Elec. Co. v. Joiner,* —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F.3d 594, 596 (9th Cir.1996). We "give the trial court the deference that is the hallmark of abuse of discretion review," even though the ruling on the admissibility of expert testimony was dispositive of the motion for summary judgment and determined the outcome of the case. *Joiner,* —— U.S. at ——, 118 S.Ct. at 518; *see Lust,* 89 F.3d at 597.

### I. *Hearing procedure*

■ Cabrera argues that the district court followed the wrong procedure at the hearing when it allowed Cordis to cross-examine Cabrera's witnesses first and did not allow the experts to testify on several issues. Cabrera's counsel made no objections to the order of proof or the time he was allotted for questioning. Cabrera therefore cannot complain now. *Long v. Director, OWCP,* 767 F.2d 1578, 1583 (9th Cir.1985) (party who failed to object at hearing cannot challenge on appeal failure to allow cross-examination); *Hawaiian Rock Prods. v. A.E. Lopez Ents.,* 74 F.3d 972, 976 (9th Cir.1996) (arguments not made before district court are waived).

■ Cabrera contends that this rule does not apply to procedural objections. The reason for alerting a court to the grounds of objections so that they may be addressed applies equally to procedural and substantive objections, however, and we reject this distinction.

### II. *Expert testimony*

■ In *Daubert,* the Supreme Court held that the test for admitting scientific expert testimony under *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923), which required that a scientific technique be "generally accepted" as reliable in the scientific community, was superseded by the adoption of the Federal Rules of Evidence. *Daubert,* 509 U.S. at 587, 113 S.Ct. at 2793–94. Federal Rule of Evidence 702 provides:

**Testimony by Experts**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under *Daubert,* a district court may admit expert scientific opinion if it qualifies as "scientific knowledge," that is, if it has a "grounding in the methods and procedures of science ... [and is] more than subjective belief or unsupported speculation." 509 U.S. at 590, 113 S.Ct. at 2795. "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method .... [to] establish[ ] a standard of evidentiary reliability." *Id.*

■ District court judges perform a "gatekeeping role," *id.* at 597, 113 S.Ct. at 2798, and may apply four nonexclusive factors to determine whether proffered expert opinion is developed by the scientific method or is "junk science:"

District court judges are to consider not only (1) whether the method has gained general acceptance in the relevant scientific community, but also (2) whether the method has been peer-reviewed, (3) whether the method "can be (and has been) tested," and (4) whether there is a "known or potential rate of error." *Id.* at 594, 113 S.Ct. at 2797.... [T]he *Daubert* inquiry is flexible.... "One very significant fact" is whether the expert has "developed [his]

opinions expressly for purposes of testifying," since "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert*, 43 F.3d at 1317. That the expert failed to subject his method to peer-review and to develop his opinion outside the litigation is not dispositive, but if these guarantees of reliability are not satisfied, the expert "must explain precisely how [he] went about reaching [his] conclusions and point to some objective source ... to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field." *Id.* *Lust*, 89 F.3d at 597 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.) ("*Daubert II* "), cert. denied, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert II*, 43 F.3d at 1318.

Cabrera presented four expert witnesses, and the district court rejected the testimony of all four.

### A. Saul Puszkin, Ph.D.

 Saul Puszkin is a Ph.D. in neuroscience, and he has worked more than twenty years in the fields of pathology and immunology. Puszkin testified that he examined under a microscope two tissue slides from Cabrera. One showed no foreign bodies. The other, taken from a cyst on Cabrera's head, showed the presence of a giant cell reaction to a foreign particle that Puszkin could not identify. Puszkin could have tested the slide for the identity of the foreign particle, but did not because he was not asked to do the test, and because the test would have required taking the prepared slide apart. He thus testified that he "never talked about silicone at all in [his] report." On cross-examination, defense counsel asked Puszkin about the report of Dr. Allan Anes, M.D., a pathologist who examined the tissue and found that the foreign body was not silicone but keratin, which occurs naturally in the human body.[1] Puszkin was not aware of the test but conceded that he did not know whether keratin or silicone was present.

The district court concluded that because Puszkin could not identify the foreign body causing the giant cell reaction, his testimony was "simply irrelevant under F.R.E. 401 and is not, in and of itself, helpful to the trier of fact under F.R.E. 702."

On appeal, Cabrera argues that Puszkin's testimony was "highly relevant" because he "testified that based upon his examination of the two tissues [sic] slides, Plaintiff was suffering from a foreign body reaction most likely caused by the shunt." Yet, at the *Daubert* hearing, plaintiff's counsel stated that Puszkin would testify to the location of the cells relative to the shunt, "but he's not going to testify that the shunt is the source of the ... cells." Because he had never tested for the source of the reaction, Puszkin could not connect it to silicone or any other substance. Puszkin's only testimony thus would have been that the tissue from the cyst showed a foreign body reaction.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Cabrera argues that the testimony regarding the reaction was relevant as a "building block," and that other experts would establish the nature of the foreign particle. The existing evidence in this case, however, included a report from Dr. Anes, who had tested the same tissue and found the same foreign body reaction. Unlike Puszkin, however, Dr. Anes had tested the foreign particle and identified it as keratin. There was thus evidence in the record of a foreign body reaction, and Puszkin's testimony to the same effect, without any statement that he had tested the foreign particle and determined its identity, would have been a "needless presentation of cumu-

---

1. The district court's order incorrectly describes Dr. Anes as an expert for the defense. Dr. Anes was not an expert. His status as an expert is irrelevant, however, because he agrees with the one opinion to which Puszkin can testify (the presence of a foreign body reaction). Puszkin did not even perform the test that Dr. Anes performed, so there was no need to judge the weight of Dr. Anes' test results.

lative evidence." Fed.R.Evid. 403. Although Puszkin's evidence was relevant to Cabrera's claim, we conclude that the district court did not abuse its discretion in excluding it, because its probative value was outweighed by the waste of time that would be involved.

### B. *Aristo Vojdani, Ph.D.*

■ Aristo Vojdani holds a Ph.D. in immunology. Cabrera wanted Vojdani to testify that he had tested a sample of her blood in August 1993, and found the presence of silicone antibodies. Those antibodies would support Cabrera's contention that she was undergoing an autoimmune response to silicone. Cordis opposed the admission of his testimony because Vojdani's test for silicone antibodies was not scientifically reliable as required by *Daubert.* The district court agreed that the test did not satisfy *Daubert.*

First, the court noted that only Vojdani used the test he had performed on Cabrera's blood, and there is no generally accepted blood test for silicone antibodies. Cabrera counters that two other labs perform a similar test. At the hearing, however, the district judge sustained Cordis' objection to the introduction of test results from another laboratory, and Vojdani testified only that several other laboratories perform silicone antibody tests, although he did not know if they performed the same test he uses. Vojdani also testified that his test had never been peer-reviewed. Vojdani had no documentation of even his own development of the test, as his records were destroyed in an earthquake. Further (although this is not dispositive), the Federal Drug Administration does not recognize any silicone antibody test at all.

The district court was within its discretion in excluding Vojdani's testimony. Vojdani provided no explanation of " 'precisely how [he] went about reaching his conclusions' " regarding the accuracy of his testing measure, and could not " 'point to some objective source ... to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.' " *Lust,* 89 F.3d at 597 (quoting *Daubert II,* 43 F.3d at 1317). Although Cabrera argues that the test results should

have been admitted because the test was conducted with no connection to the litigation, that argument does not substitute for the lack of foundation for the test itself. The district court properly considered the methodology Vojdani used, rather than the test results, and did not abuse its discretion by finding it lacking in reliability.

### C. *Nachman Brautbar, M.D.*

■ Dr. Nachman Brautbar is a board-certified internist with a specialty in nephrology (the study of the kidney). Cabrera proffered Dr. Brautbar to testify that Cabrera had an "autoimmune disease with atrophy" caused by the silicone in the shunt. Dr. Brautbar had examined Cabrera and found her normal except for a rash on the skin, and a history of complaints about fatigue, joint pain suggesting arthritis, and muscle weakness. He did not take blood or urine samples. He did not know the silicone composition of the shunt in Cabrera's head, nor of any shunt on the market. Nevertheless, he testified that in his opinion Cabrera's "disease processes" were caused by silicone from the shunt.

Dr. Brautbar examined Cabrera in conjunction with the litigation (he advertised his services on the World Wide Web as an expert for plaintiffs in silicone gel breast implant cases). He could not cite any research connecting Cabrera's symptoms with a shunt. Although he claimed that the body's reaction to hard silicone, such as in the shunt, is more intense than its reaction to the gel silicone used in breast implants, he could identify no articles documenting the difference in the reaction, or even the existence of any reaction at all.

"One very significant fact" about Dr. Brautbar's testimony is that he "developed [his] opinions expressly for the purpose of testifying." *Daubert II,* 43 F.3d at 1317. Dr. Brautbar could not identify any peer-reviewed research justifying his conclusion about reaction to hard silicone. The sources discussed at the hearing involved hypersensitivity reactions to malfunctioning shunts and an article by Randall Goldblum, M.D. regarding localized inflammatory reactions to revised shunts. But hypersensitivity is not

identical to a systemic autoimmune reaction, and Dr. Goldblum's article specifically declined to attribute even the localized inflammation to silicone antibodies. In an affidavit, Dr. Goldblum further stated that Dr. Brautbar's conclusions were not supported by his research or any other known research.

The connection with the litigation and the lack of supporting research do not alone make Dr. Brautbar's opinion inadmissible, but because he cannot point to some peer-review articles or research supporting his conclusion, he "must explain precisely how [he] went about reaching [his] conclusions and point to some objective source ... to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field." *Id.* at 1319. Dr. Brautbar did not identify any such objective source, or demonstrate that he followed a scientific method embraced by at least some other experts in the field. His testimony therefore does not satisfy *Daubert* or Rule 702. *See Schudel v. General Elec. Co.*, 120 F.3d 991, 997 (9th Cir.1997) (district court abused its discretion in admitting expert testimony when witness "could not testify to a specific cause and effect relationship between ... exposure and health problems").

In the process of its discussion of Dr. Brautbar's testimony, the district court mentioned the testimony of Joan Venes, M.D., Cordis's proposed expert neurosurgeon, who cited authority that there is no connection between silicone implants and autoimmune disease. Cabrera takes exception to the district court's comment regarding Dr. Venes's testimony because Dr. Venes was not an expert in immunology or pathology. In fact, the court never ruled on whether or to what extent Dr. Venes' expert testimony would be admissible, reserving that issue for trial.

The comment regarding Dr. Venes was in the form of an aside. The district court had already assessed Dr. Brautbar's testimony and found it lacked the reliability required by *Daubert.* We conclude that the district court did not abuse its discretion in excluding Dr. Brautbar's testimony.

### D. *Pierre Blais, Ph.D.*

Pierre Blais holds a Ph.D. in physical chemistry. Cabrera named him as her design defect expert. He was to testify that the fin tipped catheter was defective because it eventually became entrapped in brain tissue, and that the shunt was defective because it contained an inappropriate composition of silicone. Yet Blais testified that he had never tested any shunts; that he had never published any articles on shunt composition or design; that no peer-reviewed articles supported his views; that no research shows clinical problems resulting from silicone toxicity in a hydrocephalus shunt; and that no articles existed regarding degradation of the shunt. Blais stated that relevant "information was essentially left unpublished and unlearned. It was not conveyed to the medical community on average. It is what we call an aficionado's knowledge .... it has simply been kept very closed to manufacturing circles and has not been shared with the medical community." By Blais's own characterization, he is relying on underground knowledge, untested and unknown to the scientific community. An opinion based on such unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702. *See Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir.1997) ("Rule 702 demands that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs.")

The district court did not abuse its discretion in excluding Blais' testimony.

### CONCLUSION

We affirm. The district court did not abuse its discretion in excluding the scientific opinion expert testimony of Cabrera's experts. The grant of summary judgment was appropriate because without the experts, Cabrera could not prove causation or liability.