**FITEQ INC, Plaintiff,**

v.

**VENTURE CORPORATION, et al., Defendants.**

**Case No. 13-cv-01946-BLF**

United States District Court, N.D. California, San Jose Division.

Signed 03/14/2016

Darrell Rae Atkinson, Diane Sue Rice, Spencer Hosie, Anthony Kenhong Lee, Hosie Rice LLP, San Francisco, CA, for Plaintiff.

Patricia Refo, Phoneix, AZ, Sid M. Leach, David Barker, Patricia Lee Refo, Jacob Christensen Jones, Richard H. Herold, Jr., David Eric Rogers, Snell and Wilmer LLP, Phoenix, AZ, Brian G. Arnold, Snell & Wilmer LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

[Re: ECF 313]

BETH LABSON FREEMAN, United States District Judge

Though now almost unbelievable, this case began with a partnership between the parties to build a groundbreaking payment card that would combat fraud. FiTeq and Venture entered into an Operating Agreement ("OA"), pursuant to which each party had responsibilities: FiTeq was to design, develop, market, and sell the card, while Venture was to "seamless[ly] manufactur[e]" it. ECF 199-26, OA Recitals. The agreement was highly sequenced, with ten milestones, each of which had up to nine component parts. See ECF 199-26, OA Exh. B.

The joint project ultimately failed, but the parties dispute which—and most importantly whose—action caused the failure. In the motion now before the Court, Defendants identify alleged inactions, failures and misrepresentations by Plaintiff that they deem the breaking point. On that basis, Defendants move for summary judgment in their favor on the following issues related to Plaintiff's claims: 1) that the OA precludes Plaintiff's lost profits and enterprise valuation damages; 2) that the fact

and quantum of those damages are speculative as a matter of law, 3) that Plaintiff's fraud claims fail as a matter of law, 4) that FiTeq, not Venture, breached the OA, and 5) that FiTeq cannot enforce the OA against Venture because Venture and FiTeq were mutually, or Venture was unilaterally, mistaken about material facts related to performance under the OA. *See* ECF 313. In addition, Defendants seek summary judgment in their favor as to liability on each of their counterclaims—three breach of contract claims, a conversion claim, and a breach of the covenant of good faith and fair dealing.[1] For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

## I. BACKGROUND

The following facts are undisputed. In 2009, FiTeq and Venture entered into an Operating Agreement to develop payment cards (i.e., debit or credit cards). *See* ECF 199-26. FiTeq knew that Venture had no experience developing or selling cards. *See, e.g.,* ECF 313-14, Exh. 44 at 1 (email from FiTeq's Eric Foo to Venture's Chia Kar Lin stating "I know this kind of lamination process development is new to your people"); ECF 313-4, Exh. 12 at 123 (deposition testimony by FiTeq's CEO Joan Ziegler that FiTeq "definitely knew" that lamination was new to Venture). In contrast, Ms. Ziegler had been CEO of PrivaSys, FiTeq's predecessor company. *See, e.g.,* ECF 313-2, Exh. 2, July 16, 2014 Ziegler Dep. at 73–74.

Under the OA, Venture was responsible for providing "engineering and manufacturing services to FiTeq," OA § 3.1, and would "serve as FiTeq's sole source for the engineering services," *id.* § 3.2. Meanwhile, FiTeq had to use best efforts to assist Venture in certifying a card, certifying Venture's facility, and selling and marketing cards. *Id.* § 4.1.4(a). In addition, if there were "fundamental flaws in the design," FiTeq had a duty to provide notice and an acceptable cure recommendation to Venture. *Id.* § 3.1(e). The parties also agreed to "consult, cooperate, and use their best efforts to complete the services." *Id.* § 4.3.4.

Before the cards could be sold, they had to be certified by at least one Payment Network, such as Visa, MasterCard, American Express, or Discover. *See, e.g.,* ECF 313-2, Exh. 4 at 92 (Ms. Ziegler's deposition testimony that "no one would sign a contract without a certified product"); ECF 313-3, Exh. 5 at 34 (David Patterson's deposition testimony that certification is "imperative").

Though the parties dispute the precise requirements for certification, Plaintiff's expert, Brad McGoran, and Defendants' expert, Henry Dreifus, agree that minimum standards for certification exist. *See* ECF 313-6, Exh. 25, Dreifus Rebuttal Report ¶ 21; ECF 313-5, Exh. 23, McGoran Initial Review at 6. Some of these requirements pertain to personalization, though the parties dispute whether or not those requirements can be waived. *Compare*

---

1. The Court notes that Defendants improperly request summary judgment for different issues in their Notice of Motion and in the "Issues Presented" section of their supporting memorandum. *See* ECF 313 at 1. In the Notice, Defendants seek summary judgment in their favor on Plaintiff's claims in their entirety and on each of Venture's counterclaims as to liability. Mot. at 1. In the issues presented, Defendants break their challenges to Plaintiff's claims into component parts but do not

mention their counterclaims. *Id.* at 1-2. Because Defendants clearly intend to seek summary judgment on the component parts of Plaintiff's claims and on liability for their counterclaims and because both parties briefed their papers accordingly, the Court construes this motion as one for summary judgment on the component issues of Plaintiff's claims and liability on Defendants' counterclaims.

Exh. 25 ¶ 9 (personalization occurs "according to the [ISO] standards") *with* Exh. 23 at 8 ("personalization processes ... can also adversely affect a card's ... ability to pass the requisite standards"). The parties also dispute whether FiTeq, Venture, or both developed the specifications for the card.

A card's manufacturing and personalization facilities must also be certified. In addition, back-end software—such as FiTeq's Authenticator software—is necessary to make the card work. Venture was not responsible for, or involved with, personalization or the software. *See* OA § 16.

To develop the FiTeq card, Venture used a lamination manufacturing method. In 2012, while still obligated to work exclusively with Venture, FiTeq began working with Innovatier, now part of FiTeq, to develop the cards. Innovatier uses a non-lamination method called "reaction injection molding" (RIM). *See, e.g.,* Exh. 1 at 98-99.

The OA was terminated in January 2013. After the termination, FiTeq represented to Defendants that it could personalize its RIM cards. *See* ECF 313-12, Exhs. 31, 32 (emails from Plaintiff's counsel referencing personalization facility in San Francisco). Over the course of seven days between November 2014 and February 2015, FiTeq made 194 RIM cards it deemed suitable for testing. *See, e.g.,* Exh. 25 ¶¶ 31-35. The parties dispute the number of certification requirements those cards met. To date, Fiteq's card technology, personalization facility, and software have not been certified.

Plaintiff brought three breach of contract claims against Defendants—one against Venture for breach of the OA (Count I) and one against each Defendant for breach of the Common Stock Purchase Agreement and Novation and Supplemental Agreement (Counts II and III). In addition, Plaintiff alleges that both Defen-

dants engaged in fraud in the inducement (Count IV) and fraud (Count V). *See* ECF 77, Second Amended Complaint (SAC) ¶¶ 202-243.

Defendants answered and filed five counterclaims: three for breach of the OA— specifically, failure to pay for sample cards (Counterclaim I), failure to pay for stocks and inventory (Counterclaim II), and generally (Counterclaim IV)—as well as breach of the covenant of good faith and fair dealing (Counterclaim V) and conversion (Counterclaim III). ECF 80, Answer and Counterclaims ¶¶ 77-104. Defendants now seek summary judgment.

## II. LEGAL STANDARD

■ "A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM North America Corp.,* 750 F.3d 1036, 1049 (9th Cir.2014) (quoting Fed. R. Civ. P. 56(a)). "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas. Co. v. Geary,* 699 F.Supp. 756, 759 (N.D.Cal. 1987).

■ "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.,* 627 F.3d 376, 387 (9th Cir.2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Id.* "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine is-

sues for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*

"The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona,* 750 F.3d at 1049. " 'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.' " *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## III. DISCUSSION

### A. Lost Profits and Valuation Damages

Defendants begin by challenging Plaintiff's lost profits and valuation damages on two grounds: first, that such damages are barred by the terms of the OA and, second, that Plaintiff will be unable to bear the burden of proving these damages with reasonable certainty at trial.

#### 1. The Operating Agreement

Defendants argue that FiTeq cannot recover lost profits or enterprise valuation damages pursuant to the OA's limitation of damages clause, § 13.4. Mot. at 10. Not surprisingly, the parties dispute not the language of § 13.4, but its effect.

Contract interpretation is a question of law to be determined by the Court. *See, e.g., TRB Investments, Inc. v. Fireman's Fund Ins. Co.,* 40 Cal.4th 19, 27, 50 Cal.Rptr.3d 597, 145 P.3d 472 (2006). California law makes clear that the "fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties." *Id.* The intent of the parties "at the time the contract is formed" governs the Court's interpretation, *see* Cal. Civ. Code § 1636, and

this intent "is to be inferred, if possible, solely from the written provisions of the contract." Cal. Civ. Code § 1639.

Thus, the Court begins this inquiry by turning to § 13.4 itself, which provides

Neither Party nor its affiliates shall be liable to the other Party or its affiliates under any legal or equitable theory of liability (including, without limitation, breach of contract, strict liability, negligence, or other tort, or breach of statutory duty), for any special, incidental, indirect, consequential, punitive, or exemplary damages arising out of, related to, or connected with this Agreement in any way (including, without limitation, any damages resulting from lost profits or loss of business)..."

ECF 199-26 at 26.

Defendants argue that, because the OA specifically excludes "damages resulting from lost profits or loss of business," Plaintiff cannot recover lost profits or enterprise valuation damages under the OA. Mot. at 10; *see also* ECF 335, Reply at 7.

Plaintiff disagrees on two grounds. First, Plaintiff argues that "[u]nder long-settled California law, fraud renders a limitation of damages clause unenforceable." Opp. at 17-18. Plaintiff is correct that "[contractual] releases of future liability for fraud and other intentional wrongs are invariably invalidated" under California law, *see Farnham v. Super. Ct.,* 60 Cal.App.4th 69, 71, 70 Cal. Rptr.2d 85 (Cal.Ct.1997); *see also McQuirk v. Donnelley,* 189 F.3d 793, 796 (9th Cir.1999). However, to the extent that Plaintiff is arguing that the entire clause is invalid because it cannot apply to fraud or other intentional acts, Plaintiff misreads the law.

California Civil Code § 1668 provides, "contracts which have for their object, directly or indirectly, to exempt anyone from

responsibility for his own fraud, or willful injury to the person or property of another ... are against the policy of the law." Thus, § 1668 renders the OA's limitation of liability unenforceable to the extent that it would insulate Defendants from liability for fraud or willful injury. *See WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C 13–5304 SC, 2014 WL 2621465, at *9–10 (N.D.Cal. June 12, 2014). Beyond that, the limitation holds. Thus, the Court cannot agree with Plaintiff that the limitation on damages in § 13.4 is invalid on this basis.

Next, Plaintiff contends that the clause excludes only special or indirect damages and that lost profits and enterprise valuation are direct damages, which remain recoverable. Opp. at 18. Plaintiff bases this argument on deposition testimony by Angeline Khoo, who Plaintiff describes as Venture's drafting lawyer. *See* ECF 331-10, Exh. 127 at 218.

 Because the Court agrees with Defendants that the contractual language is clear on its face, this argument is irrelevant.[2] "If the contractual language is clear and explicit, it governs." *County of San Diego v. Ace Prop. & Cas. Ins. Co.*, 37 Cal.4th 406, 415, 33 Cal.Rptr.3d 583, 118 P.3d 607 (2005) (citing *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992)). Defendants are correct that § 13.4 explicitly bars Plaintiff from recovering lost profits or enterprise valuation damages—that is, "damages resulting from lost profits or

loss of business"—on any claim other than fraud or other intentional acts. Therefore, the Court GRANTS Defendants' motion for summary judgment that Plaintiff cannot recover lost profits or enterprise valuation damages for its three breach of contract claims and DENIES Defendants' motion for summary judgment that Plaintiff cannot recover lost profits or enterprise valuation damages for its fraud and fraud in the inducement claims.

### 2. Speculative as a Matter of Law

Defendants next ask the Court to determine that the fact and quantum of Plaintiff's lost profits and enterprise valuation damages are speculative as a matter of law. ECF 313, Mot. at 1, 2-4, 10-15.[3] Defendants argue that "[l]ost anticipated profits cannot be recovered if it is uncertain whether any profit would have been derived at all from the proposed undertaking." Mot. at 10 (quoting *Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 883–84, 116 Cal.Rptr.2d 158 (2002)).

In this motion, Defendants do not attack Plaintiff's damages on the basis of the evidence they anticipate Plaintiff will offer. Instead, they present nine factual claims that they argue preclude Plaintiff from offering any evidence that could prove the fact or quantum of its lost profits and valuation damages with reasonable certainty. The Court considers each claim in turn.

---

**2.** Furthermore, though Plaintiff correctly quotes Ms. Khoo's deposition testimony that "[d]irect damages would remain recoverable," *see* ECF 331-10, Exh. 127 at 218, Plaintiff does not quote the numerous times that she disclaims knowledge of the relevant law. *See, e.g., id.* at 218 ("I don't know about US law" and "I'm not an expert on exclusion clauses."). Thus, even if the Court were to consider attorney deposition testimony when interpreting a contract, the testimony here would be entirely unpersuasive.

**3.** The Court recently considered the speculative nature of Plaintiff's lost profits and valuation-based damages in its Order Granting Motion to Exclude Testimony About FiTeq's Alleged Lost Profits and Valuation ("Exclusion Order"). *See* ECF 350. Pursuant to that Order, the Court has already excluded evidence of the bulk of Plaintiff's asserted damages.

*i. Specifications*

 First, Defendants argue that the specifications Plaintiff directed or authorized Defendants to use could not have led to certification of the card, which is a prerequisite for sales. Mot. at 10-11. Specifically, they argue that Plaintiff directed them to develop a card with track 2 data and a swipe speed of only 25 inches per second ("IPS"), instead of the track 1 data and 118 IPS required for certification, and agreed that Defendants could develop a card without ATM functionality, also required for certification. *Id.* at 10-11. Defendants assert that FiTeq could therefore never have sold its cards and "the Court should enter summary judgment that FiTeq's lost profits and enterprise valuation damages are speculative for this reason alone." *Id.* at 11.

To prove that a speed of 118 IPS is required for certification, Defendants point to Mr. Dreifus' Rebuttal Report. However, the report states that real-world swipe speeds vary from approximately 4 IPS to 118 IPS and that MasterCard requires a speed within that range as well. *See* Exh. 25 ¶¶ 57-58; *see also* ECF 313-11, Exh. 25-13 at 7-8 (MasterCard requirement of 4 to 118 IPS). Because Defendants claim that Plaintiff directed them to build a card with a 25 IPS swipe speed, Defendants have failed to show an absence of evidence to support Plaintiff's damages on the basis of deficient swipe speed specifications.

Defendants do offer sufficient evidence to meet this burden regarding the necessity of track 1 data and ATM functionality for certification, as well as the significance of certification for sales. Defendants offer specifications from Visa, MasterCard, and the International Organization for Standardization ("ISO") that all reference or require track 1 data. *See* ECF 313-7, Exh. 25-1 at 3.3.2.1 (Visa Product and Service Rules stating that the "Magnetic Stripe ... must be encoded on both track 1 and track 2"); ECF 313-11, Exh. 25-7 at 3-4 (ISO standards describing track 1 structure and information content); ECF 313-11, Exh. 25-13 at 7-8 (MasterCard requirements listing Track 1 and Track 2). Defendants also provide Mr. Dreifus' Rebuttal Report and Ms. Ziegler's deposition testimony to corroborate this requirement. *See* Exh. 12 at 76:10-15 (Ms. Ziegler's testimony that she remembers MasterCard CSI specifications from 2010 requiring track 1 data); Exh. 25 ¶¶ 42-45 (Mr. Dreifus' Rebuttal Report stating that each payment network and the ISO require both track 1 and track 2 encoding on all cards).

Similarly, Defendants identify the ATM functionality requirement in Visa and MasterCard certification requirements. *See* Exh. 25-1 at 6.2.3.2 (Visa's requirements for participation in its ATM Network in the U.S. Region); Exh. 25-2 at 3.6 (MasterCard's requirements for ATMs). Defendants again point to Mr. Dreifus's reports to corroborate this reading of the Visa and MasterCard documents. *See* ECF 313-5, Exh. 24 ¶ 39; Exh. 25 ¶ 49.

Then, to prove that certification is required for selling cards, Defendants offer opinions and deposition testimony by both parties' experts. *See* Exh. 25 ¶¶ 20-22 (Mr. Dreifus' opinion that "certification is a crucial requirement for payment networks"); Exh. 23 at 6-8 (Mr. McGoran's report stating "certification is of paramount importance" and "[t]esting and certification often comprise the first steps in the acceptance process and are always prerequisites to mass deployment"); ECF 313-2, Exh. 3 (Mr. McGoran's deposition testimony that "I am not familiar with any payment ... brand that does not require certification") at 32:5-34, 99:3-101:14.

This evidence regarding the necessity of track 1 data and ATM functionality for card certification and sales suffices to meet Defendants' burden to show an absence of

evidence to support Plaintiff's damages because the parties were working toward deficient specifications. Plaintiff now bears the burden of showing that its lost profits and valuation damages remain a triable issue.

Plaintiff does not dispute the general existence and importance of certification requirements, nor that Venture was working, at least for a limited time, toward a card with track 2 data and no ATM functionality. However, Plaintiff argues that, when asked by member banks, payment networks will frequently issue "variances"—temporary exceptions from particular card metrics—and that MasterCard issued a variance for the FiTeq card. Opp. at 11.

To establish the existence of this practice, Plaintiff offers Mr. Dreifus' deposition testimony. *See* ECF 331-7, Exh. 107 at 126-127 (stating that financial institutions can drive networks to grant variances and that Visa and MasterCard have granted variances in the past). To show that such a variance issued here, Plaintiff offers an email from Joan Acosta, Leader of Fraud Management Solutions at MasterCard Worldwide, to a Venture employee that states, "MasterCard has formally granted a variance to ... pursue testing of the two-button card with Venture." ECF 313-17, Exh. 109.[4] Viewing the evidence in

---

4. Defendants object to this Exhibit and at least 100 others in a dense, essentially indecipherable list that spans nearly two pages of its Reply but offers less than 100 words of explanation. ECF 335, Reply at 14-15. Instead, this baffling presentation of evidentiary objections essentially functions as a choose-your-own-adventure for the Court, laying out thirteen independent grounds for objections in clusters followed by lists of 50-100 exhibits. The Court has no obligation to "sift through the extensive material cited and speculate as to what material is objectionable." *Melendez v. Morrow Cty. Sch. Dist.*, Civ. No. 07–875–AC, 2009 WL 4015426, at *9 (D.Or. Nov. 19, 2009). Nor is it the Court's role to conjure up persuasive arguments for Defendants.

Nevertheless, recognizing the importance of the admissibility of evidence, the Court has reviewed Defendants' objections to the exhibits upon which it relied. Even for those exhibits, the Court is often left to guess to which portions of the exhibit the objections pertain. For example, faced with a Rule 403 objection to Exhibit 119, an email exchange about scheduling between FiTeq and Venture employees spanning nine emails, the Court is left to wonder which portion Defendants find objectionable—surely not Ms. Ziegler's statements that Mr. Foo was on holiday or that she had dinner plans the evening of July 17. ECF 331-9.

To the extent that the Court was able to discern Defendants' objections to the exhibits the Court relies upon, it rules as follows: Defendants' blanket Rule 402 objections are OVERRULED. The Court will give the evidence the weight it deserves. Defendants' blanket 403 objections are OVERRULED because Defendants have failed to even identify, much less establish, the prejudice that could result from considering the evidence. The Court is unable to discern how Rules 601 (competency) and 602 (personal knowledge) apply to the exhibits Defendants challenge and therefore OVERRULES the objections. The Court OVERRULES Defendants' Rule 701, 702, and 703 challenges, finding that the exhibits challenged on this basis and relied upon by the Court do not include expert testimony; to the extent that any of the exhibits tend toward expert opinions, the Court finds that they are admissible "because of the particularized knowledge that the witness has by virtue of his or her position in the business." *See* Fed. R. Ev. 701 Advisory committee notes. Defendants' Rule 901 objections are OVERRULED in light of Plaintiff's declaration that the exhibits are "true and correct" copies. *See* ECF 331. Upon careful consideration, the Court also OVERRULES Defendants' Rule 802 objections. The majority of the exhibits upon which the Court relies and that Defendants challenge on this basis are emails from Venture employees and are therefore admissible party-opponent statements. *See, e.g.,* Exhs. 108, 110, 11, 112, 114, 115, 182. The remaining exhibits challenged on this basis fall within the business records exception or do not constitute hearsay.

Finally, the Court OVERRULES Defendants' objections on the basis of Fed. R. Civ. P. 56(c)(1)(A) and this Court's Standing Orders for failure to cite particular parts of volumi-

the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the Court finds that this evidence suffices to create a genuine issue of material fact as to whether or not Plaintiff was directing Defendants to work toward specifications that would necessarily fail. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

### ii. Personalization

■ Defendants next contend that Plaintiff cannot personalize cards and that Plaintiff still has no certified card personalization facility. Mot. at 11. Defendants argue that, since personalization is necessary for certification and a personalization facility is necessary for sales, Plaintiff therefore cannot prove lost profits or valuation damages with reasonable certainty. *Id.* at 11-12.

To support their position, Defendants first argue that personalization—the process of adding the cardholder's name, account number, card expiration date, and card verification number to a manufactured card, *see* Exh. 25 ¶ 9—was entirely Fiteq's responsibility. Defendants first point to § 16 of the OA, which provides, "Venture shall have an option to provide personalization services at cost of no more than $1 per FiTeq Card if required by a Card Issuer. FiTeq shall assist Venture to become a MasterCard or Visa Card secure facility for personalization services." ECF 199-26. In addition, Defendants offer deposition testimony by Plaintiff's Rule 30(b)(6) witness stating that "we [FiTeq] handle the personalization," ECF 313-2, Exh. 4 at 63, and by Ms. Ziegler that personalization "would go through FiTeq," ECF 313-3, Exh. 6 at 124.

Plaintiff disputes that it had sole responsibility for personalization, arguing that § 16 gave Venture the right to personalize at its election. However, neither party suggests that Venture exercised that right.

Defendants next offer evidence to show that neither Plaintiff nor its predecessor, PrivaSys, has ever personalized cards or certified a personalization facility. Mot. at 11. Specifically, Defendants offer: 1) Ms. Ziegler's deposition testimony that FiTeq does not have a certified personalization facility, ECF 313-3, Exh. 6 at 124; 2) deposition testimony by Innovatier's Rule 30(b)(6) designee that plans to certify Innovatier's facility for personalization were only in development as of September 2014, ECF 313-4, Exh. 10 at 48-49; 3) Mr. Dreifus' report regarding FiTeq's February 2015 attempt to personalize 230 cards, which resulted in only 194 cards after 4.5 hours of a manual process, ECF 313-6, Exh. 25 ¶ 35; 4) test results from FIME, the French testing laboratory with which Mr. Dreifus contracted to test FiTeq's cards, showing that the cards failed personalization requirements, ECF 313-10, Exh. 25-3 at 76-77; and 5) deposition testimony by a PayPal representative stating that PayPal had security concerns about a personalization facility in San Francisco, ECF 313-4, Exh. 9 at 26-27.

Finally, Defendants offer evidence, including Mr. Dreifus' Rebuttal Report, to show that personalization is necessary for certification and sales. *See, e.g.,* Exh. 25 ¶ 9. This evidence suffices to meet Defendants' burden to show a lack of evidence regarding the certainty of Plaintiff's lost profits and valuation damages on the basis of personalization, thereby shifting the burden to Plaintiff to show a triable issue

---

nous exhibits. To the extent that the Court relies on any of these exhibits, the Court has clearly gleaned the relevant portions. Furthermore, the Court cannot help but note the

irony of Defendants presenting this objection at the end of a 2-page onslaught of general evidentiary objections to those same full exhibits.

of material fact regarding its ability to personalize, to certify a personalization facility, or to sell cards regardless.

Plaintiff responds that MasterCard certified a PrivaSys manufacturing facility for personalization in 2005 and that FiTeq is currently leasing space and owns an expensive machine for personalization. Opp. at 20-21. To support its first point, Plaintiff provides a letter dated January 14, 2005 from Luis Ferreira, Associate VP and Head of MasterCard International's Global Vendor Certification Program, to Caitlin Kurtz, PrivaSys' Vice President of Operations, advising PrivaSys that "your facility ... is certified to add electronic components to MasterCard branded products... This work could also include partial personalization." ECF 331-10, Exh. 135. For its second point regarding FiTeq's current facility and machinery, Plaintiff provides an affidavit from Ms. Ziegler, stating that FiTeq leases a building in San Francisco, which "will serve as Fiteq's personalization facility" and currently houses a card personalization machine. ECF 332, Ziegler Dec. ¶ 7. In addition, Plaintiff offers Ms. Ziegler's deposition testimony that FiTeq leased a personalization site during the term of the OA. ECF 331-13, Exh. 190 at 124-125. In response to Mr. Dreifus' description of the personalization trial, Ms. Ziegler explains that the machine malfunctioned on the day cards were to be personalized for Defendants. Ziegler Dec ¶ 7.[5] Finally, Plaintiff again disputes Defendants' position that personalization is necessary for certification on the ground that networks can exempt cards from those requirements through variances.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff is capable of personalizing cards, as required for certification and sales. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

### iii. Certification

■ Third, Defendants argue that Plaintiff's inability to certify or sell a card after nearly 16 years of trying, whether as PrivaSys or as FiTeq, working with three different designs teams, and using different manufacturing processes shows that the card's success is necessarily speculative. Mot. at 12.

Defendants begin with evidence to show that FiTeq's technology is nearly 16 years old. Defendants point to Plaintiff's allegation in its original Complaint that "[w]ith an earlier entity, PrivaSys, FiTeq has been engaged in this development effort for more than a decade." ECF 1, Compl. at 2. In addition, Defendants offer Ms. Ziegler's deposition testimony describing PrivaSys as a company that emerged in 2000 to develop a battery-powered payment card and secure platform to combat fraud and shut down immediately before FiTeq's formation. ECF 313-2, Exh. 2 at 29, 41-43, 47-48; see also ECF 313-3, Exh. 5 at 38.

Defendants next offer evidence to support their contention that, after more than three years of development using its current RIM process, the FiTeq card is still not certified. Defendants direct the Court to the reports of their experts, Mr. Dreifus

---

**5.** Defendants object to this statement, arguing that it is inadmissible for lack of foundation and constitutes impermissible expert testimony by a lay witness. Defendants make this objection in the Reply Separate Statement of Facts, ECF 336 at 4, in violation of Civil Local Rule 7-3(c) ("Any evidentiary and procedural objections ... must be contained within the reply brief or memorandum."). Accordingly, the Court does not consider it, nor any other objections raised by either party in the Separate Statement.

and Darran R. Cairns, regarding FiTeq's inability to make cards during visits specifically arranged by the parties for Defendants to observe the RIM process. *See, e.g.,* ECF 313-5, Exh. 18 ¶¶12-37, 79, 43 ("FiTeq was only able to make 58 cards using a manual process" on the first visit, "was unable to make any cards because it claimed one if [*sic*] its machines was broken" on the second visit, and "was only able to make approximately 210 cards using a different manual process" over the course of 4.5 hours during the last visit, none of which included a hologram or signature panel). Furthermore, Defendants offer test results to show that, when tested by FIME, even those cards lacked or failed the majority of card certification requirements. *See* ECF 313-10, Exh. 25-3 (FIME results listing 193 cards as failing and only 1 as passing).

Finally, Defendants argue that, much like the laminated card Venture was developing, Plaintiff's RIM card can never be certified because its specifications lack at least track 1 data and ATM functionality. Defendants offer deposition testimony by Innovatier's Rule 30(b)(6) designee stating that, as of September 2014, they were working towards a card with track 2 data only, *see* ECF 313-4, Exh. 10 at 65, and deposition testimony by Mr. McGoran that in its current state the card cannot be used in an ATM, *see* ECF 313-4, Exh. 13 at 35-36. This evidence regarding Plaintiff's history of card development and the current state of its card suffices to establish a lack of evidence to show Plaintiff's lost profits and valuation damages with reasonable certainty, thereby shifting the burden to Plaintiff to show a genuine dispute of material fact.

Plaintiff responds that its RIM card will be certified. To dispute the importance of the RIM card's track 2 data and lack of ATM functionality, Plaintiff again asserts that it can get a variance from payment networks as a temporary step toward certification. To challenge the FIME test results, Plaintiff points to Mr. Dreifus' deposition testimony, in which he states that he directed the lab to change numerous "inconclusive" results to conclusive "fail" results. *See* ECF 331-7, Exh. 107 at 54-56 (Mr. Dreifus' deposition testimony that, upon seeing results labeled "inconclusive," he asked the lab to provide a definitive answer, at which point they responded "we could not guarantee [the results] as a pass" and so labeled each a "fail"). In addition, Plaintiff argues that the card passed other third-party tests and offers a summary of test results showing the card passing thirteen compatibility requirements. *See* ECF 331-10, Exh. 126 at 2.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff's RIM card is on track for certification. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

### iv. Commercial Quantities

▇ Next, Defendants assert that Plaintiff's card cannot be produced in commercial quantities and that Plaintiff therefore cannot prove lost profits or valuation damages with reasonable certainty. Mot. at 12-13. Plaintiff does not dispute its current inability to produce commercial quantities, but provides evidence to show that commercial-scale manufacturing will follow certification. *See* ECF 331-10, Exh. 132 (e-mail from Ms. Ziegler to Mr. Khan stating "... 250K/week ... is an impossible task without certification.").

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff can establish its damages with

reasonable certainty even though it currently lacks a commercialization process because that process follows certification. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

### v. Authenticator Software

 As their next ground for granting summary judgment that Plaintiff will be unable to establish lost profit and valuation damages with reasonable certainty, Defendants argue that Plaintiff's Authenticator Software is still not certified, thereby blocking the card from functioning properly and preventing Plaintiff from generating licensing fees or card sales. Mot. at 12. The parties agree that Defendants were not responsible for the Authenticator software and that it remains uncertified.

Defendants also offer evidence to show that certification of software is necessary, a fact Plaintiff disputes. Defendants provide Mr. McGoran's deposition testimony that he "understand[s it] to be true" that each payment brand requires that the software be certified, Exh. 3 at 32. He also stated that he is "familiar that ... certification standards ... need to be met" but that he would need to be referred to "a specific one" in order to discuss them. ECF 313-4, Exh. 13 at 36-37.

In addition, Defendants offer the portions of Mr. Dreifus' expert reports that state that back-end software must be certified, Exh. 24 ¶ 4, 43; Exh. 25 ¶¶ 95, 97-98. To establish that the software cannot be certified, Defendants offer the deposition testimony of John Weber, who works on the Authenticator. ECF 313-3, Exh. 8 at 24-25. Mr. Weber states that two certification processes are in progress and that FiTeq is focused on Brightsight rather than PCI, the certification Defendants highlight. Id. This evidence suffices to shift the burden to Plaintiff to show some evidence of possible software certification.

To show that certification is likely, Plaintiff offers a 2011 audit report from Brightsight finding that "each of the main required properties for security ... are present in the current system" and concluding that "the source code is well structured and the design aspects reviewed are well documented and the services implemented are regarded sound and state of the art." ECF 331-10, Exh. 134 at 5. In addition, Plaintiff argues that, unlike card certification, software certification is not required. Plaintiff supports this argument with Ms. Ziegler's Declaration. ECF 332 ¶ 9 (" 'Certification' is not required for the bank back-end Authenticator software").

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff can establish its lost profits and valuation damages with reasonable certainty notwithstanding its uncertified software, either because such certification is not necessary or because FiTeq is close to Brightsight certification. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

### vi. Manufacturing Facility

 Defendants next contend that Plaintiff still has no certified card manufacturing facility, without which it cannot provide cards and therefore cannot establish lost profits or valuation damages with reasonable certainty. The parties point to the same evidence they relied upon to dispute the personalization facility: Defendants argue that Plaintiff has not and cannot certify a facility, while Plaintiff responds that MasterCard certified a previous facility and that FiTeq is currently leasing the necessary space. In addition, Plaintiff argues that certifying the manufacturing facility was Venture's obligation

and offers an email from Venture's Thian Nie Khian to FiTeq's Eric Foo stating that "Venture is ready for GVCP (Master-Card) site certification" as evidence. *See* ECF 331-9, Exh. 122.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff can establish its lost profits and valuation damages with reasonable certainty notwithstanding the current state of its manufacturing facility. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

### vii. Customers

█ Defendants assert that the companies to which Plaintiff claims it lost sales—Discover, PayPal, Mandiri, Wells Faro, and Citibank, *see* ECF 180-1 at 9-26—would never have purchased Plaintiff's card, thereby preventing Plaintiff from establishing its lost profits and valuation damages with reasonable certainty. Mot. at 13-14. In large part, this argument is based on Defendants' now-well-trodden—and, at this stage, insufficiently supported—positions that FiTeq directed Venture to develop a card that lacked features that each customer required, including track 1 data, ATM functionality, and a sufficiently high swipe speed, and that, because FiTeq lacked certified infrastructure and software, FiTeq could not have sold the cards even if a customer wanted to buy them. Mot. at 13-14. The Court has already determined above that Plaintiff has offered sufficient evidence on each of these points for a reasonable trier of fact to find in Plaintiff's favor regarding the certainty of lost profits and valuation damages.

Defendants also offer one piece of evidence unique to this argument: deposition testimony by Faith Tucker, PayPal's Director of Card Solutions, that PayPal was not interested in the type of card FiTeq offered, ECF 313-4, Exh. 9 at 22-24, 40, 125, 137-138. This evidence would meet Defendants' burden to show a lack of evidence of customer interest if PayPal were Plaintiff's only asserted customer. Because Plaintiff also suggests that at least four other institutions were interested in purchasing the card, however, this evidence fails to meet Defendants' burden to establish a lack of evidence regarding realistic customer interest. *See, e.g.*, ECF 331-11, Exh. 136 (CitiBank's findings regarding pilot of laminated cards). Thus, the Court cannot grant Defendants' motion for summary adjudication on this basis.

### viii. Patents

█ Defendants next argue that the card they were developing is not patented and that, without a patent, anyone could have made and sold FiTeq's card had it been successful, thereby preventing Plaintiff from establishing its lost profits and valuation damages with reasonable certainty. While the Court could not grant summary judgment regarding the speculative nature of Plaintiff's lost profits and valuation damages on this ground alone given that profit is possible without a patent, the Court nevertheless considers the evidence Defendants offer in order to determine whether, when combined with Defendants' other arguments, this claim suffices.

The parties do not dispute that Plaintiff represented to Venture that the technology in the card was patented, but Defendants argue those representations are false, while Plaintiff claims they are true. Defendants offer Ms. Ziegler's deposition testimony as proof. However, in her deposition, Ms. Ziegler states that FiTeq's patent counsel described its patent portfolio to Venture as part of a due diligence call. *See* Exh. 6 at 52-56. This does not meet

Defendants' burden to show an absence of facts regarding the card's patented technology. Furthermore, Plaintiff points to evidence showing that Venture reviewed PrivaSys' patents, including an email exchange between Thian Nie Khian and Joan Ziegler, *see* ECF 331-4, Exh. 91.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that the card includes patented technology. Thus, the Court cannot grant summary judgment on this ground alone, nor does it contribute to the sum of Defendants' arguments.

### ix. Plaintiff's Admission

 Defendants assert that Plaintiff admits its entire business is highly speculative, thereby preventing it from establishing its lost profits and valuation damages with reasonable certainty. Defendants base this argument on an investor letter FiTeq sent in September 10, 2013 describing investment in FiTeq as "speculative," involving "a high degree of risk," and something that "should be considered only by sophisticated investors who ... can afford to sustain a total loss of their investment. ECF 313-12, Exh. 34 at 14-17. Defendants additionally offer deposition testimony by Ms. Ziegler stating that these risk factors were accurate to her knowledge. *See* Exh. 1 at 127-128. This suffices to shift the burden to Plaintiff to establish a triable issue of material fact regarding the certainty of its lost profits and valuation damages.

Plaintiff responds that an investor letter necessarily includes such language. Opp. at 22. Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff can establish its lost profits and valuation damages with reasonable certainty notwithstanding the letter. Thus, the Court cannot grant summary judgment on this ground alone.

### x. Combination of Factors

Finally, Defendants argue that, while sufficient on their own to show the speculative nature of Plaintiff's lost profits and valuation damages, the weight of these nine claims in combination is "overwhelming." Mot. at 16. However, as the Court described in detail above, Defendant has failed to establish any of the claims above with requisite certainty. Specifically, considering the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could determine that: i) the networks would have accepted Plaintiff's card on the basis of a variance, ii) Plaintiff is capable of personalizing cards, iii) Plaintiff's RIM card is on track for certification, iv) Plaintiff will have a commercialization process after certification, v) Plaintiff's software will be certified or does not need to be, vi) Plaintiff will soon have a manufacturing facility and did not previously as a result of Venture's misconduct, vii) Plaintiff's customers were interested but did not follow through due to Venture's failure, viii) Plaintiff's technology is patented or would have been profitable regardless, and ix) Plaintiff's statements regarding the risks of investment were prudent statements that do not preclude the possibility of profits. As a result, viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that the combination of these facts, much like each in isolation, does not preclude Plaintiff from establishing its lost profits and valuation damages with reasonable certainty. Accordingly, the Court DENIES Defendants' motion regarding the speculative

nature of the fact and quantum of Plaintiff's valuation and lost profits.

### B. Fraud Claims

The Court next considers Defendants' motion for summary judgment in their favor on Plaintiff's fraud claims (Counts IV and V). The Court begins with Defendants' argument regarding the applicable summary judgment standard. Defendants contend that, because they offer evidence showing that the alleged fraud made no economic sense, Plaintiff must provide more persuasive evidence to support its fraud claims than would otherwise be necessary at this stage. Mot. at 17.

#### 1. Plaintiff's Burden

■ Defendants rely on *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 578, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) to argue that, where it makes no economic sense for a defendant to engage in misconduct, the plaintiff has a higher burden to provide persuasive evidence at summary judgment. *Id.* at 17. Defendants contend that this higher burden applies here because Plaintiff has no evidence to suggest that Venture had any economic incentive for the alleged fraud. Rather, they argue, Venture spent three years and millions of dollars trying to develop the card in return for FiTeq stock that was valuable only if the card succeeded. Defendants offer deposition testimony by Ju Lin Lim, a damages witness, stating that Venture invoiced nearly SGD $15 million for the FiTeq project, ECF 313-5, Mot. Exh. 17 at 85-92, and a chart titled "FiTeq—Costs Incurred (YTD December 2012)" listing 14,917.9 as the total, ECF 313-16, Mot. Exh. 49.

Plaintiff does not disagree with Defendants' reading of *Matsushita*, but argues that the fraud made economic sense for Defendants. Plaintiff suggests that Defendants—based in Singapore and therefore competing with manufacturers in countries with lower costs—saw the project as an opportunity to move up the value chain from manufacturing to intellectual property and design, with effects beyond the project itself. Opp. at 14-15. Plaintiff contends that Defendants planned to "just recut the deal or outsource lamination" if necessary. *Id.* at 15.

In support of this theory, Plaintiff provides an email that includes Venture's Proposal for Purchase of equipment, ECF 331-9, Exh. 125. In the Proposal for Purchase, Venture writes that the importance of the Fiteq project "cannot be over emphasize[d] as it is strategically important to Venture... It will be the future platform that Venture can leap forward to reach the higher value add [*sic*]." *Id.* at 3. Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the Court finds a triable issue of fact regarding Defendants' incentives. Therefore, Plaintiff need not offer more persuasive evidence than is otherwise necessary to oppose summary judgment. With that standard in mind, the Court now turns to Defendants' substantive arguments against Plaintiff's fraud claims.

#### 2. Insufficient Damages

The first argument again contends that Plaintiff cannot recover its lost profits and valuation-based damages—because they are too speculative and because the OA precludes such damages—and additionally asserts that those are the only damages Plaintiff alleges for its fraud claims, which therefore fail for lack of the essential damages element. Mot. at 15-16. The Court has already determined that the first prong of this argument fails, having denied Defendants' motion for summary judgment regarding Plaintiff's lost profits and valuation damages above and having found that § 13.4 of the OA is unenforceable to the

extent that it would insulate Defendants from liability for fraud. Because the first prong of Defendants' damages-based challenge to Plaintiff's fraud claims fails, the entire argument fails. The Court cannot grant summary judgment regarding Plaintiff's fraud claims on this ground.

### 3. Causation

■■■■ Defendants next argue that the fraud claims should be determined in their favor because Plaintiff lacks evidence to prove reliance and harm. Mot. at 16-17. "Reliance is 'an essential element of fraud.'" *In re Tobacco II Cases*, 46 Cal.4th 298, 326, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009) (internal citation omitted). To prove reliance, a plaintiff must show "that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct." *Id.* (internal citation omitted). A plaintiff can show such "immediate causation" if "the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct" in the absence of the misrepresentation. *Id.* (internal citation omitted). "[T]he plaintiff need not demonstrate it was the only cause." *Id.*

■■■■ "An action for fraud or deceit also demands proof of damages caused by misrepresentations or concealment of information." *Williams v. Wraxall*, 33 Cal. App.4th 120, 131, 39 Cal.Rptr.2d 658 (1995) (quoting *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 219, 197 Cal.Rptr. 783, 673 P.2d 660 (1983)). "Fraudulent representations which work no damage cannot give rise to an action at law." *Id.* at 132, 39 Cal.Rptr.2d 658. In this context, "[c]ausation requires proof that the defendant's conduct was a 'substantial factor' in bringing about the harm to the plaintiff." *Id.* at 132, 39 Cal.Rptr.2d 658 (quoting *Mitchell v. Gonzales*, 54 Cal.3d 1041, 1052–1053, 1 Cal.Rptr.2d 913, 819 P.2d 872 (1991)).

■■■■ To determine whether or not Defendants have shown that Plaintiff has no evidence to support its fraud claims, the Court first considers Plaintiff's allegations. In the Second Amended Complaint, Plaintiff alleges that Defendants falsely represented the following: that they had expertise in designing and manufacturing sophisticated electronics; that they could build the FiTeq card successfully and on a budget; that they were seeking an EDB grant wholly unrelated to FiTeq's grant; that they met engineering milestones and certification requirements; that the cards they made worked and were properly manufactured; that the cards passed delamination requirements and peel tests; that holograms and signature panels could be attached to the cards; that the manufacturing yield for the cards was approximately 80-90 percent and improving; and that the cards had "swipe success." SAC ¶¶ 226, 236.

Defendants argue that, even if it made these misrepresentations, Plaintiff cannot establish that they immediately or substantially caused Plaintiff's inability to sell cards or to license the Authenticator software. Mot. at 16-17. Instead, Defendants contend, Plaintiff's own failures—specifically, that "card certification was impossible and there was no certified infrastructure to make or use FiTeq cards"—would have led to the harm regardless of Defendants' actions. *Id.*

Defendants point generally to the same "undisputed" facts to support this argument as they offered in support of their argument that Plaintiff's damages are too speculative. However, as discussed above, each one presents a triable issue of material fact. Therefore, the Court cannot find that Plaintiff's harm would have occurred regardless of Defendants' actions or representations. Accordingly, Defendants' mo-

tion for summary adjudication of Plaintiff's fraud claims in their favor is DENIED.

## C. Plaintiff's Breach as Excuse

Defendants next move for summary judgment in their favor on Plaintiff's breach of contract claims, Counts I-III. Mot. at 17. Defendants argue that Plaintiff, rather than Defendants, materially breached the OA, thereby discharging Defendants from their duty to perform. Specifically, Defendants contend that Plaintiff failed to 1) provide specifications that could lead to card certification, 2) develop certified Authenticator software, 3) inform Defendants that lamination was a "fundamentally flawed" process for making the cards, and 4) work exclusively with Defendants to develop the cards while the OA was in force. *See* Mot. at 1-2, 17-21. Defendants argue that the first three of these failures constituted material breach because they frustrated the purpose of the OA, as no card could ever have been certified or sold, and that the fourth is also a material breach because it significantly reduced any gains Defendants could have realized from the project. *Id.* at 19. Defendants additionally argue that this conduct breached the implied covenant of good faith and fair dealing and that Plaintiff should therefore be estopped from asserting breach against them. *Id.* at 20-21.

The Court has addressed the first two points above. Again, the Court finds that Plaintiff has provided sufficient evidence to create a genuine issue for trial on each one: a reasonable trier of fact could find that the parties had variances approving deviations from the certification standards and that Fiteq's software can be certified. Thus, the Court cannot, at this stage, determine that Plaintiff breached the OA, thereby relieving Defendants of their obligations.

▮ Defendants next argue that Plaintiff expressly breached its duty under the OA to provide notice of and an acceptable cure recommendation for any fundamental flaw in the design by failing to inform Defendants that Plaintiff believed lamination was a "fundamentally flawed" approach. Mot. at 18-19. Defendants offer Ms. Ziegler's deposition testimony that "it was very important to...get away from the lamination as the sole means of keeping the card together because we always had air bubbles" using that technique at PrivaSys. ECF 313-2, Exh. 2 at 102-103. Defendants additionally point to Ms. Ziegler's deposition testimony that FiTeq turned Privasys' lamination process over to Venture "[w]ith its known design flaws," ECF 313-2, Exh. 1 at 83, and sent a prototype laminator to Venture, ECF 313-2, Exh. 2 at 100-101. Defendants also offer similar deposition testimony by Mr. Foo— that he "transfer[red] whatever know-how in [*sic*] PrivaSys to Venture," including manufacturing process instructions for lamination, and delivered the manual prototype machine to Venture. ECF 313-4, Exh. 11 at 92, 98-99. This evidence suggests that Plaintiff provided Venture with a manufacturing process it knew to be flawed.

However, this evidence also shows that Plaintiff communicated these flaws to Venture. For example, Ms. Ziegler testified that FiTeq "went to Venture at the beginning [and] the one thing we really focused on in getting scale manufacturing is [ ] we can't use that lamination, because it's inherently flawed." ECF 313-2, Exh. 2 at 102-103. Similarly, Mr. Foo testified that "of course, when I transferred those document[s with process instructions]... I also let [Venture] know that this is [a] manual process" with a "very long" cycle time. Exh. 11 at 92. Mr. Foo testified that FiTeq did not know which process was best and so "le[ft] it open" to give Venture a chance to improve lamination because he saw Venture as a "solid engineering company" with "the resources to actually ... improve [the

process]." *Id.* at 93-94. At the same time, he alerted Venture to other production processes, like Innovatier's RIM process, "so at least [Venture] ha[d] an alternative to choose what [it] want[ed]." *Id.* at 92-94. This evidence does not suffice to show that Plaintiff believed the lamination process would necessarily fail. In addition, the evidence suggests that Plaintiff alerted Defendants to the challenges of the manual lamination process early in their collaboration. Thus, the Court finds that Defendants have not met their burden for summary judgment on this basis.

Finally, Defendants argue that Plaintiff breached the OA by working with Innovatier to develop the card while contractually obligated to exclusively use Venture, *see* OA § 3.2. Defendants offer a chart titled "FiTeq, Inc., Profit & Loss Detail" to show that FiTeq began making payments to Innovatier in 2012. *See* ECF 313-16, Exh. 56 (showing payments to Innovatier for "Hardware" beginning in February 2012). This evidence suffices to shift the burden to Plaintiff to show a triable issue regarding its breach of § 3.2.

Plaintiff does not dispute that it worked with Innovatier as early as 2012, but contends that it did so at Venture's request and that FiTeq's independent work with Innovatier did not begin until October 2014, more than a year after the termination of the OA. Opp. at 11-13, 24. The evidence Plaintiff provides to show Venture's desire to work with Innovatier in 2012 includes: 1) an email from Mr. Thian titled "Innovatier—The Path Forward" stating "we want to move forward quickly to validate the Innovatier process[ ] for capacity expansion instead of buying more and higher capacity lamination equipment," ECF 331-7, Exh. 110 at 2; 2) an email dated February 13, 2012 from Wong Chee Weng, then Director of Venture's R&D Development, to Ms. Ziegler describing his visit to Innovatier and his excite-

ment regarding the injection molding process, ECF 331-8, Exh. 111; 3) a February 6, 2012 email from Mr. Thian proposing that Venture license Innovatier's technology and do the manufacturing itself, ECF 331-8, Exh. 112; 4) a June 2012 email from Innovatier's Lawrence Keim to Venture employees discussing a draft license agreement between Innovatier and Venture, ECF 331-8, Exh. 113; 5) a July 2012 email from Mr. Thian proposing that "[w]e move ahead with Innovatior's [*sic*] process evaluation/adaptation to FiTeq card design," ECF 331-8, Exh. 114; and 6) an email from Mr. Thian to Ms. Ziegler stating that without closure on SOWs between Venture and FiTeq on ATM and display cards, the "Innovatier evaluation/process adaption are on hold" on July 18, 2012, ECF 331-9, Exh. 119. On the basis of this evidence, cast in the light most favorable to Plaintiff, a reasonable trier of fact could conclude that Venture led the charge to involve Innovatier throughout 2012. Thus, the Court cannot find, at this stage, that Plaintiff breached the OA by engaging a third party for engineering. Accordingly, Defendants' motion for summary adjudication of Plaintiff's breach of contract claims on this basis is DENIED.

### D. Mistake as Excuse

Defendants next ask the Court to find that Defendants are excused from performing under the OA because Defendants, or both parties, were "at least mistaken about" 1) card personalization being required to meet card certification requirements; 2) certification of Plaintiff's Authenticator software being required; and 3) the fact that lamination was "inherently flawed." Mot. at 21. Defendants argue that, if both parties were mistaken, Plaintiff cannot enforce the OA against Defendants because Defendants would not have entered into or continued performance under the OA had they known the truth. *Id.* at

22. Alternatively, Defendants argue that if only they were mistaken, Plaintiff still cannot enforce the OA against them because it knew or should have known that Defendants were mistaken and took advantage of that mistake. *Id.* at 22.

However, Defendants do not offer any evidence of mistake. Instead, they again ask the Court to consider the evidence offered above to show that Plaintiff provided deficient specifications and that Plaintiff knew the lamination process was inherently flawed—evidence the Court has already found insufficient at this stage and that, furthermore, does not suggest a mistaken belief by either party. Accordingly, Defendants' motion for summary judgment of the breach of contract claims in their favor on the basis of mistake is DENIED.

### E. Liability on Counterclaims

Finally, Defendants ask the Court to grant summary judgment in their favor on Plaintiff's liability for their counterclaims based on Plaintiff's failure to 1) assign 50 percent of the manufacturing intellectual property to Defendants, 2) pay for Defendants' stocks and inventory, and 3) pay for the Citibank prototype cards.

#### *1. Assignment of Intellectual Property*

Defendants argue that pursuant to § 8.5 of the OA, Plaintiff must assign them 50 percent of intellectual property related to "Venture's lamination process" and "Venture's design of the card's internal coil for SMT application." Mot. at 19. Under § 8.5, "FiTeq and Venture shall be co-owners of any intellectual property that is related to the manufacturing process of the FiTeq Cards." Defendants offer deposition testimony by Ms. Ziegler stating that the coil design is important for card manufacturing, ECF 313-4, Exh. 12 at 143, and deposition testimony by Venture's Chia Kar Lin identifying the lamination process as a manufacturing process, ECF 313-4, Exh. 15 at 19. Finally, Defendants

point to ¶ 9 of the declaration by Venture's C.H. Tan to establish that Plaintiff has not assigned this IP to Defendants. ECF 313-12, Exh. 33 ¶ 9. This evidence suffices to shift the burden to Plaintiff.

In response, Plaintiff argues that the OA assigns FiTeq 100 percent of IP developed in the design and engineering phase and 50 percent of the IP developed in the manufacturing phase. However, this mischaracterizes the language of the agreement, which, as quoted above, grants co-ownership over IP "related to the manufacturing process," not developed in the manufacturing phase. The only piece of evidence Plaintiff offers for this argument—an October 2011 email from an attorney assisting in the management of Venture's IP portfolio to FiTeq's patent attorney stating that an invention was "solely created by the employees of Venture" but "the parties agree that such invention will be co-owned"—does not support it. ECF 331-4, Exh. 89 at 1. Accordingly, the Court agrees with Defendants' reading of the OA.

With regard to classifying the lamination process and internal coil design as "related to the manufacturing process," Plaintiff does not contest the former but identifies the latter as design work. However, Plaintiff offers no evidence to support its position. Similarly, Plaintiff offers argument but no evidence to dispute Defendants' position that it has not assigned them the IP rights. Accordingly, the Court GRANTS Defendants' motion for adjudication that Plaintiff is liable to Defendants for not assigning them co-ownership of IP related to the lamination process and coil design.

#### *2. Payment for Stocks and Inventory*

Defendants argue that the OA requires Plaintiff to purchase Venture's remaining stocks and inventory upon termi-

nation of the OA and that Plaintiff has not paid for them. Mot. at 19. Defendants direct the Court to § 12.4(h) of the OA, which provides, "all stocks and inventory shall be sold to FiTeq at the last agreed Unit Price and a price equal to their cost to Venture, respectively." Defendants do not ask the Court to determine the amount FiTeq owes, but only that it is liable to buy back stocks and inventory.

Plaintiff does not dispute that it has not paid Defendants for stocks and inventory, *see* ECF 85, Pl.'s Answer ¶ 68, but disputes the amount Venture requests. Opp. at 24. Because the amount is not before the Court and Plaintiff has failed to present any other triable issue, the Court GRANTS Defendants' motion for summary adjudication of Plaintiff's liability for payment for stocks and inventory.

### 3. Payment for Prototype Cards

■ Finally, Defendants contend that Plaintiff must pay Venture for approximately 2,000 prototype cards Venture made for a Citibank trial and for which Plaintiff received $300,000. Defendants offer Ms. Ziegler's deposition testimony that Venture made about 2,000 prototype cards with a number of rejects, resulting in approximately 1,100 cards for the trial. Exh. 6 132-133. Ms. Ziegler also testified that Citibank paid $300,000 for the cards and for related training services. *Id.* In addition, Ms. Ziegler acknowledged that FiTeq agreed to pay an amount on a per-card basis and that FiTeq has a reserve on its books for the payment *Id.* This evidence suffices to shift the burden to Plaintiff.

Plaintiff disputes its liability to pay for the Citibank prototypes. It offers an August 2012 email from Mr. Thian stating "[t]he SOW does require Venture to produce 5,000 cards to demonstrate yield of 95% at PP." Given the date of the email, it is unclear whether the requirement applies to the Citibank cards, produced in 2010-2011. Furthermore, the email continues, "[FiTeq] will pick up the tab for the testers." A reasonable trier of fact could not read this email to relieve Plaintiff of its obligation to pay for the prototype cards.

Plaintiff additionally argues that it has no obligation to pay for defective cards, and offers a study showing various defects in the cards provided to Citibank, *see* Exh. 132, but does not provide support for its lack of obligation to pay for such cards. Accordingly, Plaintiff has failed to establish a triable issue of material fact and Defendants' motion for summary adjudication in their favor of Plaintiff's liability to pay for the cards developed for the Citibank trial is GRANTED.

**IT IS SO ORDERED.**